850 P.2d 978

**Harley H. SWINK, Trustee, Plaintiff–Appellant,**

v.

**Valetta Ruth FINGADO, Defendant–Appellee.**

**No. 20364.**

Supreme Court of New Mexico.

March 2, 1993.

Leslie C. King, III, James R. Jurgens, Santa Fe, for plaintiff-appellant.

Robert Waldman, J. Bart Wright, Albuquerque, for defendant-appellee.

## OPINION

MONTGOMERY, Justice.

The United States Court of Appeals for the Tenth Circuit certified to this Court the following question of New Mexico law:[1]

> Do the 1984 amendments to § 40-3-8 N.M.S.A.1978 (as enacted), apply retroactively so as to convert property acquired by husband and wife as joint tenants prior to the passage of the amendments, and thus originally held as separate property, into community property which would be included in the bankruptcy estate?

*Swink v. Sunwest Bank (In re Fingado),* 955 F.2d 31, 32 (10th Cir.1992).

The 1984 amendments referred to in the question were contained in an act passed by the legislature that year, 1984 N.M.Laws, Chapter 122, entitled "AN ACT RELATING TO PROPERTY; AMENDING CERTAIN SECTIONS OF THE NMSA 1978 TO CLARIFY KINDS OF COMMUNITY PROPERTY; DECLARING AN EMERGENCY." Section 1 of the act ("the 1984 Act") amended NMSA 1978, Subsection 40-3-8(A) (Repl.Pamp.1983), to delete from the definition of "separate property" the phrase "each spouse's undivided interest in property owned in whole or in part by the spouses as co-tenants in joint tenancy or as co-tenants in tenancy in

1. Pursuant to NMSA 1978, § 34-2-8 (Repl.Pamp.1990), and SCRA 1986, 12-607 (Supreme Court may answer questions certified by certain federal courts if questions involve propositions of New Mexico law determinative of cause before certifying court and there are no controlling precedents from New Mexico appellate courts).

common." Section 1 of the 1984 Act also amended Subsection 40–3–8(B) by adding the following sentence to the definition of "community property" in that subsection: "Property acquired by a husband and wife by an instrument in writing whether as tenants in common or as joint tenants or otherwise will be presumed to be held as community property unless such property is separate property within the meaning of Subsection A of this section." NMSA 1978, § 40–3–8(B) (Repl.Pamp.1989).

Section 2 of the 1984 Act amended one of the sections of Article 2 of the Probate Code, dealing with the subject of intestate succession and wills. That section, NMSA 1978, Section 45–2–804 (Repl.Pamp.1989), is headed "Death of spouse; community property" and provides that upon the death of either spouse one-half of the community property belongs to the surviving spouse and the other half is subject to the testamentary disposition of the decedent. The 1984 amendment added this clause: "except that *community property that is joint tenancy property* under Subsection B of Section 40–3–8 NMSA 1978 shall not be subject to the testamentary disposition of the decedent." Subsection 45–2–804(A) (emphasis added).

The effect of the 1984 amendments, then, was to make clear that marital property which is not separate property under Subsection 40–3–8(A), even though acquired by the spouses through an instrument designating them as joint tenants, is presumed to be held as community property and that such property may be *both* community property *and* joint tenancy property, in which case it is not subject to the testamentary disposition of either spouse. In other words, under the 1984 amendments the right of survivorship—the principal attribute of joint tenancy property, *Trimble v. St. Joseph's Hospital (In re Trimble's Estate)*, 57 N.M. 51, 54, 253 P.2d 805, 807 (1953)—continues to inhere in community property that is joint tenancy property.

2. *See infra* note 21.

3. Under NMSA 1978, § 47–1–35 (Repl.Pamp.1991), a conveyance in this form is sufficient to create a joint tenancy.

*See* § 40–3–8(B); *see also* § 40–3–8(D) (legal incidents of holding property as joint tenants, including the right of survivorship, are not altered by 1973 revision of community property statutes).

For the reasons explained and subject to the qualification noted in this opinion,[2] we answer the Tenth Circuit's question in the affirmative. We hold that property acquired before 1984 by a husband and wife through an instrument designating them as joint tenants is presumed to be held as community property, even though it may also be held as joint tenancy property.

## I.

The properties in question were acquired by Mr. and Mrs. Fingado in 1964 and 1969. The parcel acquired in 1964 was located on Vermont Street in Albuquerque, New Mexico, and was purchased for rental purposes; the other parcel was located on Rio Grande Boulevard in Albuquerque and was purchased as the Fingados' residence. Both properties were conveyed to "H.S. Fingado and Valetta Ruth Fingado, his wife, as joint tenants."[3] The record contains no evidence as to whether the funds used to make the purchases were community or separate in character.

In 1987, an involuntary petition in bankruptcy was filed against the Fingados under Chapter 7 of the United States Bankruptcy Code.[4] The petition was later dismissed as to Mrs. Fingado. In October 1989, the Trustee in bankruptcy, Harley H. Swink, sold the property on Vermont Street but retained the proceeds pending an adjudication of the rights of the parties to those proceeds.

Two months later, the Trustee petitioned the bankruptcy court for authority to sell the property on Rio Grande Boulevard. Mrs. Fingado objected to this sale, claiming a one-half interest in the property. She also claimed one-half of the proceeds from the sale of the Vermont Street property.

4. The Bankruptcy Code is codified as Title 11 of the United States Code (1988 & Supp. III 1992).

She asserted that both properties were joint tenancy properties and that, under Bankruptcy Code Subsections 363(h) and (j), her one-half interest as a joint tenant in the proceeds from the sales of the properties was her separate property and not property of the bankruptcy estate.

The Trustee, on the other hand, alleged that both properties were community property of the bankrupt debtor, Mr. Fingado, and his spouse and that the interests of both spouses were therefore property of the bankruptcy estate under Subsection 541(a)(2) of the Bankruptcy Code.[5] Mrs. Fingado concedes that if she and her husband held the properties as community property, both her interest and his became the property of the bankruptcy estate under Subsection 541(a)(2) and the proceeds from the sales of the property are distributable, under Subsection 726(c) of the Bankruptcy Code, to holders of community claims against the Fingados. It is now undisputed that all creditors asserting claims against Mr. Fingado are creditors of the community.[6]

In asserting that the Vermont Street and Rio Grande Boulevard properties were community property, the Trustee relied on Subsection 40–3–8(B), as amended by the 1984 Act. Mrs. Fingado disputed the applicability of this statute; she argued that the 1984 amendment did not apply retroactively to change the status of the properties, which, at the time of their acquisition (she maintained), were separate, not community, property.

The United States Bankruptcy Court for the District of New Mexico applied Subsection 40–3–8(B), as amended; determined that Mrs. Fingado had failed to overcome the presumption in the subsection that the properties, although held in joint tenancy, were community property; and held that, as community property, they were part of the bankruptcy estate and not subject to any claim that Mrs. Fingado would otherwise have as a co-owner under Subsections 363(h) and (j) of the Bankruptcy Code. *Swink v. Sunwest Bank (In re Fingado)*, 113 B.R. 37, 40–41 (Bankr.D.N.M.1990) (Opinion of McFeeley, B.J.). The bankruptcy court accordingly authorized the sale of the Rio Grande Boulevard property, which, pursuant to Bankruptcy Code Subsection 363(i), Mrs. Fingado purchased for $320,000 less her homestead exemption of $20,000, for a net purchase price of $300,000.

Mrs. Fingado appealed to the United States District Court for the District of New Mexico, which reversed the bankruptcy court's judgment and ordered payment to Mrs. Fingado of one-half of the net sales proceeds from both properties. The district court did not issue an opinion in connection with its judgment, but apparently took the view that the New Mexico Legislature had not intended that the 1984 amendments to Subsection 40–3–8(B) would operate retroactively. The court therefore held that the properties were each spouse's separate property when acquired and remained such at the time they were sold. The Trustee appealed to the Court of Appeals for the Tenth Circuit, which certified to us the question noted at the beginning of this opinion.

In their briefs to the Tenth Circuit (which have been submitted to us) and in their arguments here, the parties take essentially the same positions that they argued before the bankruptcy court and the federal district court. Mrs. Fingado relies principally on the thoroughly entrenched principle of New Mexico community property law that property acquired by a married couple takes its status as community or separate property at the time of its acquisition, *e.g.*, *English v. Sanchez*, 110 N.M. 343, 345, 796 P.2d 236, 238 (1990), and on the similarly well-accepted propositions

---

5. Subsection 541(a)(2) provides that the bankruptcy estate is comprised, inter alia, of "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—(A) under the sole, equal, or joint management and control of the debtor; or (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable."

6. The bankruptcy court so determined, and that determination has not been appealed.

that a statute applies retroactively only when there is clear legislative intent that it should do so, *e.g., Psomas v. Psomas,* 99 N.M. 606, 609, 661 P.2d 884, 887 (1982), *overruled on other grounds by Walentowski v. Walentowski,* 100 N.M. 484, 672 P.2d 657 (1983), and that when a statute affects vested or substantive rights, it is presumed to operate prospectively only, *see, e.g., Gray v. Armijo,* 70 N.M. 245, 247–48, 372 P.2d 821, 823 (1962). The Trustee responds that this Court's task is the familiar one of construing a statute—*i.e.,* determining legislative intent—so that we must answer the question: Did the 1984 legislature intend that the 1984 Act would operate retrospectively when it created a new presumption that, even when property is acquired and held in joint tenancy, the property is *both* community *and* joint tenancy property? The Trustee points to various indicia of legislative intent which, he asserts, demonstrate an intent to apply the 1984 amendments retroactively to property previously acquired by a husband and wife as joint tenants.

█ For the reasons that follow, we basically agree with the Trustee's position. Property acquired through an instrument establishing, or indicating ownership in, joint tenancy, even though acquired before 1984 and even though having the legal incident of the right of survivorship, is nonetheless presumed to be community property—a presumption which can be rebutted by showing that the property is properly characterized as separate property as defined by Subsection 40–3–8(A).

## II.

We begin by discussing some of the history of the 1984 amendments. In 1972,

effective July 1, 1973, the people of New Mexico adopted the Equal Rights Amendment to our Constitution: "Equality of rights under law shall not be denied on account of the sex of any person." N.M. Const. art. II, § 18. In order to implement the amendment with respect to our community property laws, the legislature enacted the Community Property Act of 1973, 1973 N.M.Laws, Chapter 320 ("the 1973 Act"). NMSA 1978, § 40–3–7 (Repl.Pamp.1989) (purpose of act). *See generally* Anne K. Bingaman, *The Community Property Act of 1973: A Commentary and Quasi–Legislative History,* 5 N.M.L.Rev. 1 (1974).[7] The 1973 Act, with post–1973 amendments, is presently compiled as NMSA 1978, Sections 40–3–6 to –17 (Repl.Pamp.1989 & Cum.Supp.1992). To comply with the Equal Rights Amendment, the 1973 Act significantly changed several of this state's community property laws by eliminating property-law distinctions based on gender. *See* Bingaman, *supra,* at 1.

Left intact by the 1973 Act were several sections from prior law, dating from 1907 [8] and providing generally (with certain exceptions [9]) that a husband and wife may own property as they see fit. Thus, NMSA 1978, Section 40–2–2 (Repl.Pamp.1989), provides that "[e]ither husband or wife may enter into any engagement or transaction with the other ... which either might, if unmarried...." Section 40–2–8 provides: "A husband and wife cannot by any contract with each other alter their legal relations, *except of their property...."* (Emphasis added.) Section 40–3–2 states: "Husband and wife may hold property as joint tenants, tenants in common or as community property."[10] Not essentially af-

---

7. The author of this article, then an associate professor at the University of New Mexico School of Law, was a member of a committee of distinguished New Mexico lawyers appointed by the State Bar to assist the Equal Rights Committee of the legislature in drafting changes to New Mexico law required by the Equal Rights Amendment. Bingaman, *supra,* at 1 & n. 2.

8. 1907 N.M. Laws, ch. 37.

9. The common-law estates of dower and curtesy have been abolished since 1907. 1907 N.M.

Laws, ch. 37, § 17 (current version at NMSA 1978, § 45–2–113 (Repl.Pamp.1989)). Tenancies by the entireties were abrogated when New Mexico enacted statutes adopting the community property system. *McDonald v. Senn,* 53 N.M. 198, 207, 204 P.2d 990, 995 (1949) (per curiam).

10. Although in common usage the conjunction "or" denotes alternatives, the alternatives are not necessarily mutually exclusive. *See Haynes v. Bonem,* 114 N.M. 627, 632, 845 P.2d 150, 155, (1992) ("The disjunctive 'or' does not exclude the

fected by the new Act, but incorporated into it, was the bedrock presumption of our community property system: "Property acquired during marriage by either husband or wife, or both, is presumed to be community property." Subsection 40–3–12(A); [11] see Bingaman, *supra*, at 24.

Section 3 of the 1973 Act enacted a new section in the 1953 Compilation of our statutes, Section 57–4A–2, headed "Classes of property." In Subsection 57–4A–2(A), "separate property" was defined comprehensively, the components of the definition for the most part being consistent with prior law but with a few changes added by the drafters to accomplish various purposes. *See* Bingaman, *supra*, at 3–7. One of these changes was the addition of the following new component in Section 57–4A–2(A): "(6) each spouse's undivided interest in property owned in whole or in part by the spouses as co-tenants in joint tenancy or as co-tenants in tenancy in common." *See* 1973 N.M.Laws, ch. 320, § 3.

According to Professor Bingaman,

This subsection reflects the basic conceptualization of the community property system: property in which each of the spouses owns an interest can be held by them only as community property or as the separate property of each of them. Under [NMSA 1978, § 40–3–2], which remains in effect, the spouses are accorded the right to hold property between them as community property, as joint tenants or as tenants in common. This subsection merely states that the common law property estates of joint tenancy and tenancy in common are, in a community property system, a separate property interest of each spouse, not community

property in which the other spouse has a one-half interest.

Bingaman, *supra*, at 7.

As such, the new component reflected the common-sense notion that each spouse's interest in property held by them together in some form of co-ownership constituted his or her separate property; that is, neither spouse had any claim on the undivided interest of the other spouse in property held by the two of them in some form of cotenancy. From this common-sense standpoint, the statute might as easily have declared that each spouse's undivided interest in property owned by the spouses as community property was his or her separate property.

In any event, however rooted in common sense this new definitional component may have been, its conceptual underpinning had not been followed by this Court twenty-six years previously. In *August v. Tillian*, 51 N.M. 74, 178 P.2d 590 (1947), we upheld the contention of the successors of a deceased wife that a conveyance to her and her husband granted her a one-half interest as her separate property and that she and her husband held the other half as their community property. *Id.* at 75–77, 178 P.2d at 590–92. Professor Bingaman states that Subsection 57–4A–2(A)(6) of the 1953 Compilation reversed the decision in *August v. Tillian* and made it clear that the interest of each spouse in property owned by the two of them, whether those interests are equal or unequal, is the separate property of that spouse. Bingaman, *supra*, at 7–8.

Of course, classifying a spouse's undivided interest in a joint tenancy with the other spouse as separate property did not *ipso facto* answer every conceivable question. For example, if the spouse's interest was

conjunctive 'and' unless the context so requires.").

**11.** Before 1973, this basic presumption—which we have characterized as "the mainstay of our community property system," *In re Trimble's Estate*, 57 N.M. at 53, 253 P.2d at 806—was contained in the first clause of NMSA 1953, Repl.Vol. 8, Part 2 (1962) § 57–4–1, which read: "All other real and personal property acquired after marriage by either husband or wife, or both, is community property...." Although

phrased as a declaration, this statute was consistently treated as creating a presumption. *See, e.g., Campbell v. Campbell*, 62 N.M. 330, 340, 310 P.2d 266, 272 (1957) (stating that presumption "was part of Spanish community property law and was recognized as an element of the community property system in this state prior to ... its statutory pronouncement" by 1907 N.M.Laws, ch. 37, § 10). Section 57–4–1 of the 1953 Compilation was repealed by § 14 of the 1973 Act and was replaced by what are now NMSA 1978, §§ 40–3–8 and 40–3–12(A).

truly separate property, would it be subject to the statutes of descent and distribution upon the spouse's death (as is the case with an undivided interest in a tenancy in common)? Even to pose such a question seems absurd, because, as already noted, the chief incident of a joint tenancy is the right of survivorship, so that the deceased spouse's interest passes by survivorship to the surviving joint tenant. *Id.* at 8. This difference in treatment for the distinct nature of a spouse's undivided interest in a joint tenancy with his or her spouse was expressly preserved by the legislature in Section 3 of the 1973 Act (NMSA 1953, § 57–4A–2(D), now NMSA 1978, § 40–3–8(D)), providing that the legal incidents of holding property as joint tenants or as tenants in common, including but not limited to the right of survivorship in a joint tenancy, are not altered by the 1973 Act. The question does, however, illustrate the difficulties that may arise when one assumes that *all* legal consequences are automatically determined by classifying an item of property, or an interest in property, as "separate" or "community."

While the 1973 Act preserved the right of survivorship of a spousal joint tenancy, it altered other legal incidents of holding property in such a joint tenancy. Those incidents concern the liability of property in which each spouse owns an undivided equal interest (as a joint tenant or a tenant in common) for satisfaction of one spouse's separate debts; the liability of property in which each spouse owns an undivided equal interest for satisfaction of community debts; and the requirement that (except for purchase-money mortgages) the spouses must join in all transfers, conveyances, or mortgages (or contracts to transfer, convey, or mortgage) any interest in real property owned by the spouses as cotenants in joint tenancy (or in tenancy in common). These provisions from the 1973 Act now appear in substantially the same form in NMSA 1978, Subsections 40–3–10(A), 40–3–11(A), and 40–3–13(A), respectively.

With respect to the debt collection provisions, Professor Bingaman notes:

> The thought here was that community funds are probably used to purchase property in which each spouse holds either an equal or a one-half interest and that such property should be treated as community property is treated insofar as debt collection is concerned.

These sections change a legal incident of the common law estates of joint tenancy and tenancy in common: the traditional unhampered ability of a creditor to levy on the interest of a debtor joint tenant or tenant in common to satisfy a debt.

Bingaman, *supra,* at 10. Similarly, she comments:

> Although a spouse's interest in a joint tenancy is separate property under the definition contained in § 57–4A–2(A)(4) [sic] [NMSA 1978, § 40–3–8(A)(6) before its amendment in 1984], the creditor may not, under this section, reach property in which the spouses hold equal interests as joint tenants or tenants in common. Such property was excluded from the first stage of debt satisfaction because of the preference for the joint tenancy form of property ownership which banks, savings and loans, brokerage houses, realtors and title companies seem to have. Many married persons, because of the common use of joint tenancy forms by such institutions, have arguably transmuted what was community property to the separate property interest of each of them by opening joint checking accounts, stock accounts or the like on joint tenancy forms provided by these institutions. Because of this common occurrence, it was thought desirable, for purposes of debt satisfaction, to equate property in which each spouse had one-half interest in the form of community property, and property in which each had an equal interest as joint tenants or tenants in common.

*Id.* at 18 (footnote omitted).

Professor Bingaman provides a similar rationale for the requirement that both spouses join in conveyances, mortgages, etc., of property held in joint tenancy. She says:

This represents a change both from present New Mexico law where persons not spouses are co-tenants, and from the common law rule that a tenant in either a joint tenancy or a tenancy in common may convey his interest without joinder of the other tenants. Once the decision was made to retain the present requirement that the spouses join in any conveyance of community real property held in some other form of joint ownership, it seemed inconsistent not to extend the joinder requirement to situations where the spouses held real property as joint tenants or tenants in common, especially in an era when the joint tenancy form of ownership is so preferred by lay persons, title companies and real estate brokers.

*Id.* at 10–11 (footnote omitted).[12]

From this bit of "quasi-legislative history," we see that the 1973 New Mexico Legislature enacted several measures dealing with a spouse's interest in property held in joint tenancy form. First, that interest was defined as the spouse's separate property, even though the asset in which he or she held the interest may have been acquired with community funds or may have been otherwise traceable to community property. Second, to forestall any possible argument that this characterization of the interest had all of the characteristics of true separate property, the legislature expressly preserved the survivorship incident of joint tenancy property. Third, recognizing that, owing to the practices of banks, title companies, and others—as well perhaps as to the preference of many married couples to hold their assets in a form enabling the survivor to receive full ownership without the intervention of probate in the event of one spouse's death—the legislature treated as community property, for debt satisfaction purposes, *all* property in which the spouses held equal undivided interests as joint tenants (or tenants in common) and, for purposes of transfers of property, likewise required joinder by each spouse for *all* property in which the spouses were cotenants. Thus, the 1973 legislature came close to recognizing the "hybrid" form of property ownership (community property in joint tenancy form) that had

---

**12.** Professor Bingaman cites a 1954 study by a noted authority on the community property law of New Mexico, Joe W. Wood, former Chief Judge of the New Mexico Court of Appeals and at the time Assistant Director of the New Mexico Legislative Council Service. Judge Wood's study found that 70 percent of the deeds to real property held by husbands and wives in Bernalillo County, the most populous county in New Mexico, were joint tenancy deeds. Bingaman, *supra,* at 11 n. 19 (citing Joe W. Wood, *The Community Property Law of New Mexico* 20 (1954)).

Similarly, a 1961 article in the *Stanford Law Review* reported that over 85 percent of all deeds to husbands and wives in twelve California counties were issued in joint tenancy form, and stated that the vast majority of California property acquired by families was financed by community funds. Yale B. Griffith, *Community Property in Joint Tenancy Form,* 14 Stan.L.Rev. 87, 88 & nn. 4–5 (1961). The author of this article, who advocated legislative and judicial recognition of the hybrid form of property ownership suggested by the title to his article, remarked:

> The *Siberell* rule that community property and joint tenancy cannot coexist has been interpreted to mean that the property involved must have either all the characteristics of true joint tenancy or all the characteristics of community property. This interpretation must be modified. It does not comport with the practices of the real estate and securities markets....
>
> Obviously the incidents of these two types of property are so different that they cannot, in all respects, coexist. But there is nothing which precludes community property being held in joint tenancy form and, in proper cases, having the survivorship incident of that form....
>
> ....
>
> One of the greatest advantages of this hybrid property is that the little fellow gets a break. In clear 'no-tax' situations where the debts are honestly paid, the termination of joint tenancy is simple and inexpensive. The joint tenancy form gives adequate protection to innocent purchasers and the surviving spouse can sell without the delays or expense of probate through the use of a simple affidavit establishing the fact of death. Courts openly accept this practice and recognize that, for the purpose of termination and when there is no prejudice to others, the survivorship feature of this hybrid stands.

*Id.* at 101–04 (footnotes omitted) (referring to *Siberell v. Siberell,* 214 Cal. 767, 7 P.2d 1003, 1005 (1932)) ("[F]rom the very nature of the estate, as between husband and wife, a community estate and a joint tenancy cannot exist at the same time in the same property.").

been advocated in California several years before.[13] The stage was thus set for adoption of the amendments in the 1984 Act.

As we have seen in the introduction to this opinion, the 1984 legislature deleted from the definition of "separate property" in Subsection 40–3–8(A) the phrase "each spouse's undivided interest in property owned in whole or in part by the spouses as cotenants in joint tenancy or as cotenants in tenancy in common." The subsection now reads:

> A. "Separate property" means:
>
> ....
>
> (5) property designated as separate property by a written agreement between the spouses, including a deed or other written agreement concerning property held by the spouses as joint tenants or tenants in common *in which the property is designated as separate property.*

NMSA 1978, § 40–3–8(A) (Cum.Supp.1992) (emphasis added). Then, as also noted at the beginning of this opinion, the 1984 legislature added this sentence to Subsection (B) of Section 40–3–8:

> Property acquired by a husband and wife by an instrument in writing whether as tenants in common or as joint tenants or otherwise will be presumed to be held as community property unless such property is separate property within the meaning of Subsection A of this section.

1984 N.M.Laws, ch. 122, § 1. And finally, the legislature in the 1984 Act made the other changes referred to at the beginning of this opinion and that will be referred to below.

The question, as certified to us by the Tenth Circuit Court of Appeals, is: Were these changes intended to operate retroactively so as to apply to property acquired before their enactment?

### III.

■ We begin with the proposition, stressed by Mrs. Fingado, that "New Mexi-co law presumes a statute to operate prospectively unless a clear intention on the part of the legislature exists to give the statute retroactive effect." *Psomas,* 99 N.M. at 609, 661 P.2d at 887. The very statement of this proposition demonstrates (by use of the word "presumes") that it is a rule or canon of statutory construction, not an inflexible determinant of legislative intent. Several reiterations of the principle by our Court of Appeals confirm this view of the rule as one of statutory construction. *See, e.g., City of Albuquerque v. State ex rel. Village of Los Ranchos de Albuquerque,* 111 N.M. 608, 616, 808 P.2d 58, 66 (Ct.App.1991) ("New Mexico law presumes that a statute will operate prospectively...."), *cert. denied,* 113 N.M. 524, 828 P.2d 957 (1992); *Minero v. Dominguez,* 103 N.M. 551, 552, 710 P.2d 745, 746 (Ct. App.1985) ("It is presumed that a statute will operate prospectively only, unless a legislative intention to give it retroactive effect is clearly apparent."); *State v. Padilla,* 78 N.M. 702, 703, 437 P.2d 163, 164 (Ct.App.1968) ("The rule of statutory construction ... [is that] 'it is presumed that statutes will operate prospectively....' "). Many other state courts have accorded the proposition this same treatment. *See, e.g., Harris v. Bauer,* 206 Mont. 480, 672 P.2d 26, 29 (1983) ("As a general rule of statutory construction, 'retroactive effect is not to be given to a statute unless commanded by its context, terms or manifest purpose.' ").

■ If the statute expressly declared that it was to be applied prospectively only, we would of course give it that effect. Conversely, if it expressly stated that it was to operate retroactively, we presumably would abide by that statement (absent some constitutional objection). The 1984 Act does not declare the legislature's intent, one way or the other. Legislative silence is at best a tenuous guide to determining legislative intent, *see Torrance County Mental Health Program, Inc. v. New Mexico Health & Env't Dep't,* 113

---

**13.** *See supra* note 12. In this connection, we note that at least three other community property states have adopted statutes providing that community property may have the survivorship incident of joint tenancy. *See* Nev.Rev.Stat. § 111.064(2) (1991); Tex.Prob.Code Ann. art. 451 (West Supp.1993); Wash.Rev.Code § 64.28.- 040 (1992).

N.M. 593, 598, 830 P.2d 145, 150 (1992), so we start with a presumption that the legislature intended the 1984 Act to operate prospectively only—but our search cannot, or should not, end there.

■ "[T]he prospective application of a newly enacted act to [a preexisting and ongoing transaction] must also be determined by the words of the statute, the legislature's intent in enacting the statute, and by the public policy considerations which are evident from the statute." *City of Albuquerque*, 111 N.M. at 617, 808 P.2d at 67. We interpret "the legislature's intent in enacting the statute" to mean the purpose of the new law—the objective the legislature has sought to accomplish. *See, e.g., Lopez v. Employment Sec. Div.*, 111 N.M. 104, 105, 802 P.2d 9, 10 (1990) (in construing statute, court looks to object legislature sought to accomplish and wrong it sought to remedy). Other state courts have applied a similar approach in construing a statute not expressly declared to be either retroactive or prospective in effect. *See, e.g., State v. Von Geldern*, 64 Haw. 210, 638 P.2d 319, 322 (1981) (statute providing that no law operates retrospectively unless otherwise expressly and obviously intended is only a rule of statutory construction and is no longer determinative when legislative intent may be ascertained); *In re Bomgardner*, 711 P.2d 92, 95–96 (Okla.1985) (when legislature has not explicitly set forth its intent, presumption against retroactivity should not be followed in complete disregard of factors that may indicate intent; only if supreme court were to fail in detecting legislative intent after looking at all available indicia would presumption of prospectivity operate).

Based on our review of the legislative history preceding the 1984 Act and of the parties' briefs in this case, we discern two primary purposes of the 1984 Act. The first purpose, as indicated by the title of the Act (*see supra*), was to "clarify" kinds of property under the community property laws then in effect. The second purpose— a much narrower and more specific purpose—was to make it clear that, under the law as so clarified, joint tenancy property held by spouses could be characterized as community property so that, upon the death of either, the survivor's tax basis in the entire property would increase (or decrease, as the case might be) to the fair market value of the property at the time of the deceased spouse's death.

### A.

As to the first purpose, we have already seen how the Community Property Act of 1973 created something of an amalgam between community property and joint tenancy concepts. We have nothing but high praise for the drafters of the 1973 Act in implementing the Equal Rights Amendment, but the result of their efforts to accommodate revised community property law concepts with the realities of the ways in which married people hold property in modern society left certain questions unanswered.

If most marital property held in joint tenancy was subject to the same strictures as applied to community property, did not the 1973 Act create—or come close to creating—a "hybrid" form of community property in joint tenancy form? Given the ways in which most married couples acquire and hold property—not just real property, but bank accounts, stocks and bonds, and other assets commonly held in the names of both spouses and joined by the word "or"—was there any reason not to give legal recognition to an undeniable fact of modern life: that many married couples hold their community assets in joint tenancy form so as to achieve the objective, if one of them dies, of vesting ownership of those assets in the survivor?

We believe that the legislature intended to answer these and similar questions, at least in part, by recognizing a new species of community property called, in the language of Section 2 of the 1984 Act (amending NMSA 1978, § 45–2–804(A)), "community property that is joint tenancy property."

■ It is an accepted principle of statutory construction in other states that a statute which clarifies existing law may

properly be regarded as having retroactive effect. Although we have found no New Mexico cases enunciating this principle, it is articulated in several opinions of our sister states. *See, e.g., Tomlinson v. Clarke*, 118 Wash.2d 498, 825 P.2d 706, 713 (1992) (en banc) ("When an amendment clarifies existing law and where that amendment does not contravene previous constructions of the law, the amendment may be deemed curative, remedial and retroactive."); *GTE Sprint Communications Corp. v. State Bd. of Equalization*, 1 Cal. App.4th 827, 2 Cal.Rptr.2d 441, 444–45 (1991) ("Where a statute or amendment clarifies existing law, such action is not considered a change because it merely restates the law as it was at the time, and retroactivity is not involved.").

Applying this principle in the present case is somewhat problematic, because the law in New Mexico at the time the 1973 Act was enacted, and probably afterwards, seems to have differentiated fairly sharply between the civil-law form of property ownership known as community property and the common-law estates of joint tenancy and tenancy in common. Indeed, in a case decided more than a half-century ago, and in language strikingly similar to that used by the California Supreme Court in *Siberell v. Siberell,* decided at about the same time (*see supra* note 12), this Court said:

> It is evident that the title to community property is a different and distinct thing from either tenancy in common or joint tenancy. What are the incidents or attributes of the community title? We must look to the statute for our answer,

instead of to the common law, as we might in cases of either of the other classes of tenancy, both of which are known to the common law. Community property is, however, a concept foreign to the English common-law system, and with us is a creature of statute.

*State v. Chavez (In re Chavez's Estate)*, 34 N.M. 258, 261, 280 P. 241, 242 (1929).

Over the years since this dictum (and it *was* a dictum), this Court and our Court of Appeals have frequently expressed the view, or taken it for granted, that joint tenancy property is a species of separate property and that to convert community property into separate property, including joint tenancy property, and vice versa, a husband and wife must "transmute" their property from one form into the other.[14] *See, e.g., In re Trimble's Estate*, 57 N.M. 51, 253 P.2d 805 (1953); *Chavez v. Chavez*, 56 N.M. 393, 244 P.2d 781 (1952); *Wiggins v. Rush*, 83 N.M. 133, 489 P.2d 641 (1971); *Estate of Fletcher v. Jackson*, 94 N.M. 572, 578, 613 P.2d 714, 720 (Ct.App.) (opinion of Wood, C.J.) ("Once the initial legal status of property, as separate or community, is determined, a change in the legal status is a transmutation issue and the *Trimble* requirement is involved when the change is between spouses."), *cert. denied*, 94 N.M. 674, 615 P.2d 991 (1980). These cases, by referring to the "transmutation" of community property into joint tenancy property, thus imply that community property and joint tenancy property are inconsistent or mutually exclusive.

On principle, however, and as a practical matter, there is no good reason why the

---

**14.** The terms "transmute" and "transmutation" are thoroughly embedded in our community property law and the law of other community property states, but the terms have unfortunate connotations. Although the word "transmute" is defined simply as "to change or alter in form, appearance, or nature: convert," another definition is "to change into another substance or element" especially gold or silver. *Webster's Third New International Dictionary* 2430 (Philip B. Gove, ed. 1976). The dictionary definitions refer to the efforts of ancient alchemists to transform base metals into gold or silver, and in this sense the term "transmutation" has acquired an almost metaphysical or "mystical sounding" connotation. *See* Robert E. Clark,

*Transmutations in New Mexico Community Property Law*, 24 Rocky Mtn.L.Rev. 1, 2 (1952). It is as though community property were some kind of substance into which (or from which) another substance—separate property—could only be converted by some kind of mysterious process. We expressly disclaim any such "mystical" use of the term. Transmutation is simply "a general term used to describe arrangements between spouses to convert property from separate property to community property and vice versa." *Allen v. Allen*, 98 N.M. 652, 654, 651 P.2d 1296, 1298 (1982) (citing William A. Reppy & William de Funiak, *Community Property in the United States* 421 (1965)).

incidents of community property should be regarded as altogether inconsistent with the incidents of joint tenancy property. In fact, our statutes, while perhaps not expressly or impliedly recognizing that these two forms of ownership may overlap, certainly do not preclude their coexistence in the same property at the same time. Although, as noted earlier, joint tenancy is one of the common-law estates incorporated into the law of this state from English law, it is now, and has been since 1971, defined by statute. NMSA 1978, Section 47–1–36 (Repl.Pamp.1991), reads:

A joint tenancy in real property is one owned by two or more persons, each owning the whole and an equal undivided share, by a title created by a single devise or conveyance, when expressly declared in the will or conveyance to be a joint tenancy, or by conveyance ... from husband and wife when holding as community property or otherwise to themselves or to themselves and others, when expressly declared in the conveyance to be a joint tenancy....

This statute, which embraces the classical "four unities" of time, title, interest, and possession,[15] certainly covers a deed to a husband and wife conveying real property, acquired by them with community funds and intended to be part of their community estate, even though the same instrument conveys title in joint tenancy. Each spouse owns the whole and an equal undivided share, and each has taken a single title through a single conveyance.

Section 47–1–36, of course, relates to real property; and real property is only one type of asset—and not necessarily the most significant—in a married couple's portfolio, large or small, of assets. What is the law relating to other kinds of assets, such as bank accounts, stocks and bonds, and the like? First, NMSA 1978, Section 47–1–16 (Repl.Pamp.1991), provides that an instrument transferring title to real *or personal property* to two or more persons as joint tenants is prima facie evidence that such property is held in a joint tenancy.[16] In *Kinney v. Ewing,* 83 N.M. 365, 369–72, 492 P.2d 636, 640–43 (1972), we accepted the contention that registering securities in joint tenancy form and establishing a joint bank account constituted prima facie evidence that the assets were held in joint tenancy (although we went on to hold that, under the facts of that case, by placing the assets in this form of ownership the original owner had not made a gift of a one-half interest in the assets to the other joint tenant).

Second, under Article 6 of our Probate Code, entitled "Nonprobate Transfers" as enacted in 1975,[17] NMSA 1978, Section 45–6–101(A) (Repl.Pamp.1989), defined an "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, savings account, certificate of deposit, share account and other like arrangement[.]" Section 45–6–101(D) defined a "joint account" as "an account payable on request to one or more of two . or more parties whether or not mention is made of any right of survivorship[.]" And Section 45–6–104, headed "Right of survivorship," provided in pertinent part: "A. Sums remaining on deposit at the death of a party to a joint account belong to the surviving party

---

**15.** "The unities of time and title require that the joint tenants' interests accrue at the same time by the same conveyance. By unity of interest is meant that the joint tenants' shares are all equal and the duration and quality (legal or equitable) of their estates are the same. Unity of possession means that each joint tenant is in possession of the whole estate, and that each is also entitled to an equal undivided share of the whole." 4A Richard R. Powell, *The Law of Real Property* ¶ 617[1], at 51–9 (rev. ed. 1992) (footnote omitted).

**16.** Section 47–1–16 provides in part: "An instrument conveying or transferring title to real or personal property to two or more persons as joint tenants ... shall be prima facie evidence that such property is held in a joint tenancy.... In any litigation involving the issue of such tenancy a preponderance of the evidence shall be sufficient to establish the same."

**17.** The 1992 legislature extensively revised Article 6 of the Probate Code, effective July 1, 1992, after this case was certified to us by the Tenth Circuit. The revisions, while amending or repealing the sections cited in the text and replacing them with other provisions, do not alter the point made in the text. *See* NMSA 1978, §§ 45–6–101 to –311 (Cum.Supp.1992).

or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created."

Finally, other statutes permit or recognize the creation of joint tenancies in savings and loan association accounts, in credit union accounts, and in motor vehicles. *See* NMSA 1978, §§ 58–10–63(B) (Repl. Pamp.1991), 58–11–43 (Repl.Pamp.1991), 66–3–122 (Repl.Pamp.1989).

Can it be seriously contended that a married couple who have placed their community funds in a joint checking or savings account, or who have invested in stocks or bonds carrying the familiar "JTWROS" designation, or who have registered a family automobile in joint tenancy, have thereby "transmuted" those funds from community property into the separate property of each of them, so that legal principles relating to community property no longer apply to that property?

The chief incident of joint tenancy is the right of survivorship. *In re Trimble's Estate*, 57 N.M. at 54, 253 P.2d at 807. The chief, or one of the chief, incidents of community property lies in the duty of the district court on dissolution of the spouses' marriage to divide the property equally. *Michelson v. Michelson*, 86 N.M. 107, 110, 520 P.2d 263, 266 (1974); *Otto v. Otto*, 80 N.M. 331, 332, 455 P.2d 642, 643 (1969). This has always been the law in New Mexico, *see Beals v. Ares*, 25 N.M. 459, 499–500, 185 P. 780, 793 (1919); community property is not the separate property of either or both spouses, whether it is held in joint tenancy or not. The 1984 legislature was on sound ground in clarifying this as the law in New Mexico and, we believe, intended to apply the 1984 amendments to *all* community property acquired by spouses as joint tenants, no matter when acquired.

### B.

This brings us to the second purpose we find underlying the 1984 Act: correcting a problem that may have escaped the legislature's attention in the 1973 Act and that needed correction to assure New Mexico married couples of the same tax benefit as is available to residents of other community property states. In brief, the problem is this: Subsection 1014(a)(1) of the United States Internal Revenue Code provides that the tax basis of property in the hands of a person acquiring the property from a decedent is the fair market value of the property at the decedent's death. 26 U.S.C. § 1014(a)(1) (1988). I.R.C. § 1014(b)(6) then provides that a surviving spouse's one-half share of community property held by the decedent and the surviving spouse under the community property laws of any state shall be considered to have been acquired from the decedent if at least one-half of the whole of the community interest in the property was includible in determining the value of the decedent's gross estate for federal estate tax purposes.

With the definition in the 1973 Act of "separate property" as including "each spouse's undivided interest in property owned in whole or in part by the spouses as cotenants in joint tenancy," a potential question existed as to whether that spouse's interest would qualify for a new (usually, a so-called "stepped-up") basis when the surviving spouse (*i.e.*, the surviving joint tenant) received it from the decedent. Under I.R.C. § 1014(b)(9), only that portion of joint tenancy property included in the decedent's gross estate receives a stepped-up basis. And, under I.R.C. § 2040(b), only one-half of the property held by a husband and wife as joint tenants is includible in the decedent's gross estate. The definition in former Subsection 40–3–8(A)(6) raised the prospect that a surviving spouse's one-half interest in joint tenancy property, even though that property was acquired with community funds or could otherwise be characterized as community property, would be ineligible, after the deceased spouse's death, for the stepped-up basis under I.R.C. § 1014(b)(6).

As a prominent federal tax service states,

A step-up in basis for the entire community property on the death of the first spouse represents a significant advantage of community ownership over com-

mon-law joint tenancies. Property held by the spouses in joint tenancy receives a stepped-up basis only to the extent it is included in the decedent's gross estate. If a husband and wife are the only joint tenants, only one half of the property is included in the gross estate of the first to die, and therefore only one half of the property receives a stepped-up basis. By contrast, the entire community property asset receives a stepped-up basis, regardless of the fact that only one half of the property is includable in the decedent's gross estate.

3 Bender's Fed.Tax Serv. (MB) § A:25.104, at A:25–21 (1991).

A 1958 tax case from a federal district court in Oklahoma (which at one time was a community property state) held that a wife's interest in a tract of land acquired by her and her husband as community property qualified for the stepped-up basis under I.R.C. § 1014(b)(6), even though the couple had taken title to the land as joint tenants. *McCollum v. United States*, 58–2 U.S.Tax Cas. (CCH) ¶ 9957 (N.D.Okla.1958). In reaching this holding, the court relied in part on *In re Trimble's Estate* and on Mr. and Mrs. McCollum's intent to hold title to the property as community property under Oklahoma law. *Id.* at 69,802. *In re Trimble's Estate* had held that "clear, strong, and convincing" evidence was necessary to prove a transmutation of community property into joint tenancy property. The court in *McCollum* apparently reasoned that the form of the deed was not conclusive and that there was otherwise insufficient evidence that the parties intended to hold the property in joint tenancy and not as community property.

While *McCollum* thus seemed to secure the eligibility of the surviving spouse's half of community property for a stepped-up basis, developments in New Mexico undermined the court's holding as it might be applied in this state. In 1955, the legislature partially overruled *In re Trimble's Estate* by passing 1955 N.M.Laws, Chapter 174, Section 1 (now compiled as NMSA 1978, Section 47–1–16, quoted *supra* note 16), providing that a transfer of property to two or more persons as joint tenants is prima facie evidence that the property is held in a joint tenancy.

Despite this statutory modification of the *Trimble* proof requirement, the eligibility of New Mexico community property for a stepped-up basis seemed secure when the 1973 Act was passed. This was especially true in light of this Court's 1971 decision in *Wiggins v. Rush*, holding that, notwithstanding a deed to the spouses as joint tenants and notwithstanding what is now Section 47–1–16, a trial court's conclusion that the spouses did not intend to hold their property in joint tenancy, but instead intended to hold it as their community property, had substantial support in the record. 83 N.M. at 135–36, 489 P.2d at 643–44.

In 1980, however, our Court of Appeals decided *Estate of Fletcher v. Jackson*. In that case, a New Mexico appellate court held, for the first time since the 1952 case of *Chavez v. Chavez*, that community property (in that case, shares of stock) was transmuted into joint tenancy property by the form of the instrument alone (in that case, reissued stock to the husband and wife as joint tenants). 94 N.M. at 576–79, 613 P.2d at 718–21. *Estate of Fletcher*, therefore, together with the definition of separate property in the 1973 Act, gave rise to the significant prospect that a court, or the Internal Revenue Service, might hold that appreciated property owned by spouses in joint tenancy form, though having all the earmarks of community property—acquisition during coverture, use of community funds for the acquisition, etc.—was not community property but was instead joint tenancy property and was therefore ineligible (insofar as the surviving spouse's half was concerned) for a stepped-up basis.

We suspect—although, given the absence of any official legislative history in New Mexico, we cannot be certain—that the 1984 Act was in large part a response to *Estate of Fletcher*, to minimize the possibility that community property in joint tenancy form might lose the advantage of receiving a stepped-up basis upon the death of

one of the spouses.[18] If so, applying the 1984 Act prospectively only would render the Act almost completely futile until after the passage of a significant amount of time. As so construed, the Act would provide no protection to the undoubtedly numerous spouses who took title to property in joint tenancy, using community funds, many years before the 1984 amendments. We therefore agree with the Trustee that the legislature intended the 1984 Act to apply retroactively to property acquired before its enactment.

## C.

The Trustee argues that two other provisions of the 1984 Act manifest a legislative intent that the Act should apply retrospectively to property acquired before its passage. The first provision appears in identical "savings clauses," in Sections 1 and 2 of the Act, in which the legislature declared that the 1984 amendments would not affect the right of any creditor accruing before the effective date of the amendments. The second provision is the emergency clause in Section 3 of the Act.

The precise wording of the savings clauses was: "The provisions of the 1984 amendments to this section shall not affect the right of any creditor, which right accrued prior to the effective date of those amendments." Subsections 40–3–8(E), 45–2–804(C). We agree with the Trustee that this clause reflects a legislative intent to apply the Act retroactively; otherwise, there would be no need for the clause. If a creditor's rights accrued before the amendments became effective and if the amendments had been intended to apply only to property acquired thereafter, the clause reserving creditors' preamendment rights would serve no apparent purpose. Assuming, however, that the amendments *were* intended to apply to previously acquired property, protecting creditors' preamendment rights could have been viewed as highly desirable (from the creditors' standpoint), if not constitutionally required. *See Ranchers State Bank v. Vega*, 99 N.M. 42, 44, 653 P.2d 873, 875 (1982) (recognizing, in dictum, that retroactive application of statute to preexisting creditors may violate Contract Clause).

The emergency clause in Section 3 of the 1984 Act read: "It is necessary for the public peace, health and safety that this act take effect immediately." Under Article IV, Section 23, of our Constitution, a clause of this sort in legislation passed by a two-thirds vote of each house of the legislature results in the statute's becoming effective immediately upon its passage and approval by the Governor. It is thus clear that the legislature intended that the 1984 amendments would take effect as soon as possible and that their effectiveness would not be delayed until ninety days after adjournment of the legislature. *See* N.M. Const. art. IV, § 23. We question, however, whether the emergency clause suggests an intention that the statute would apply to transactions occurring or property acquired before the statute's effective date. Indeed, it may suggest just the opposite: The legis-

---

**18.** Our legislature's prescience in adopting this protective measure is suggested by a revenue ruling issued by the Internal Revenue Service in 1987. In Rev.Rul. 87–98, 1987–2 C.B. 206, the Service held: "If property held in a common law estate is community property under state law, it is community property for purposes of section 1014(b)(6) of the Code, regardless of the form in which title was taken." *Id.* at 207. Under the facts assumed in the ruling, the decedent and the decedent's spouse were residents of a community property state under the laws of which taking title in a common-law estate, like joint tenancy, raised the presumption that the spouses intended to terminate their community interest and transmute the property's character from community to separate. Further, under the assumed facts, the decedent and the dece-

dent's spouse, after acquiring the property at issue, executed joint wills declaring the property to be a community asset. The ruling held that execution of these wills overcame the presumption that the spouses had transmuted their community property into joint tenancy property. Significantly, the ruling suggested that a presumption to terminate the spouses' community estate would not arise in a state which made "specific provision for the coexistence of a common law estate and a community property interest." *Id.* Revenue Ruling 87–98 thus supports the proposition that, when state laws *do* provide for the coexistence of joint tenancy and community property, the entire property owned by a decedent and the decedent's spouse will receive a stepped-up basis on the death of the decedent.

lature may not have intended that the statute apply retroactively and only intended that it should apply as soon as possible after it became effective. Perhaps the most that can be said is that the legislature was uncertain about whether it could constitutionally apply the 1984 amendments to property acquired previously. That it deemed the legislation sufficiently important to merit a declaration of emergency is clear, and that it wanted the statute to apply as soon as might be constitutionally permissible seems indisputable. As is true of legislative silence, however, legislative uncertainty provides a slender reed (or rod) upon which to lean in divining legislative intent.

### D.

■ The subject of possible constitutional infirmity of applying the 1984 Act retroactively brings us to Mrs. Fingado's other principal criterion for determining legislative intent: the rule that when a statute affects vested or substantive rights, it is presumed to operate prospectively only. Citing *Ranchers State Bank v. Vega* and *Ashbaugh v. Williams*, 106 N.M. 598, 599, 747 P.2d 244, 245 (1987), Mrs. Fingado points out that the presumption of prospective-only effect may be constitutionally required, especially if applying a newly enacted law retrospectively would diminish rights or increase liabilities that have already accrued. *See also Rubalcava v. Garst*, 53 N.M. 295, 206 P.2d 1154 (1949) (statute requiring writing cannot be constitutionally applied to bar cause of action based on oral contract formed prior to statute's enactment).

We note first that the presumption of prospective-only effect when "vested" or "substantive" rights are affected, like the presumption obtaining when the legislature does not clearly express its intent, is just that—a *presumption,* a rule or canon of statutory construction to aid in determining legislative intent when that intent is not specifically declared. Therefore, all of the indicia of the legislature's intent discussed earlier in this opinion apply to the presumption now under consideration. However, if

a valid constitutional objection exists to applying the 1984 Act retroactively, our inquiry is at an end; obviously we cannot construe the Act as applying retroactively if that construction would run afoul of the Constitution.

■ But we do not think that the 1984 Act violates the Constitution, and this for two reasons: First, we do not believe that the 1984 amendments, if applied retroactively to Mr. and Mrs. Fingado's properties acquired in 1964 and 1969, diminished or otherwise altered Mrs. Fingado's rights in the properties. Second, even if some diminution or alteration occurred, it is an accepted principle of constitutional law that the legislature can alter, retroactively, the incidents of marital property in the exercise of its police power and in recognition of the state's strong interest in governing the relationships between married persons.

When the Fingados acquired the properties, assuming they had all of the characteristics of true joint tenancies and none of the characteristics of community property, either joint tenant could have conveyed his or her fractional interest without the consent of the other. 4 George W. Thompson, *Commentaries on the Modern Law of Real Property* § 1780, at 32–33 (repl. vol. 1979); *see also* William E. Burby, *Handbook of the Law of Real Property* § 94, at 220–221 (3d ed. 1965) (joint tenant has the power and right to make an inter vivos conveyance of his undivided interest, to enter into a contract to transfer that interest, to execute a lease of that interest, and to mortgage that interest). There is no question that characterizing the Fingados' properties as community property under the 1984 amendments, even though those properties were held in joint tenancy for purposes of survivorship, altered Mrs. Fingado's rights in this respect. However, that alteration had already occurred, years before passage of the 1984 Act. As we have seen, under the 1973 Act Mr. Fingado's joinder was required for all transfers or mortgages, or contracts to transfer or mortgage, "any interest in community real property and separate real property owned by the spouses as cotenants in joint tenan-

cy or tenancy in common." Subsection 40–3–13(A).

Similarly, there might have been a question in 1964 or 1969 whether Mrs. Fingado's interest in the joint tenancy properties would have been liable for her and her husband's community debts. *See E. Rosenwald & Son v. Baca,* 28 N.M. 276, 278, 210 P. 1068, 1068 (1922) ("The separate property of the wife is not subject to community debts under the laws of this state.") (interpreting 1922 statute, which remained in effect until 1973). Again, however, this question was answered expressly in the 1973 Act, as amended in 1975, under which "[c]ommunity debts [are] satisfied first from all community property and all property in which each spouse owns an undivided equal interest as a joint tenant or tenant in common...." Subsection 40–3–11(A).

Mrs. Fingado suggests that the 1973 Act might have unconstitutionally altered her rights, and possibly increased her liabilities, as a joint tenant in property acquired before 1973. The constitutionality of the 1973 Act, however, is not before us in connection with the question certified by the Tenth Circuit; and, even if it were, we would be loath to hold that the 1973 Act, which had the purpose and effect of ridding our law of unconstitutional distinctions (perhaps under the Equal Protection Clause and certainly under the Equal Rights Amendment) between property owners based on their sex, was itself unconstitutional. We believe that the 1973 Act, as well as the amendments thereto in the 1984 Act, represented competent and proper exercises of the legislature's lawmaking power to prescribe the incidents of marital property, as we shall now explain.

Professor Bingaman notes that a California commentator has concluded that "there is no substantial constitutional objection today to retroactive amendment of presumptions in community property law...." Bingaman, *supra,* at 26 n. 52 (citing Donald C. Knutson, *California Community Property Laws: A Plea for Legislative*

*Study and Reform,* 39 So.Cal.L.Rev. 240, 266–73 (1966) (stating at 267, "[T]here is no substantial constitutional objection to effective revision by the legislature of the methods it employs to protect its legitimate interest in the marital relationship, including the property rights incident thereto.")). The commentator's conclusion—which incidentally advocates recognition of the hybrid form of community property that includes the survivorship incident of joint tenancy, Knutson, *supra,* at 255—appears in an article relying extensively on an opinion of the Supreme Court of California, *Addison v. Addison,* 62 Cal.2d 558, 43 Cal. Rptr. 97, 399 P.2d 897 (1965) (in bank). That case held that California's "quasi-community property" law (which in some respects at least was retroactive) was not unconstitutional. In so holding, the California Supreme Court relied strongly on a 1945 article in the *California Law Review,* Barbara N. Armstrong, *"Prospective" Application of Changes in Community Property Control—Rule of Property or Constitutional Necessity?,* 33 Cal.L.Rev. 476 (1945). As quoted with approval in *Addison,* Professor Armstrong's basic thesis was:

> "Vested rights, of course, may be impaired 'with due process of law' under many circumstances. The state's inherent sovereign power includes the so called 'police power' right to interfere with vested property rights whenever reasonably necessary to the protection of the health, safety, morals, and general well being of the people....
>
> ....
>
> "The constitutional question, on principle, therefore, would seem to be, not whether a vested right is impaired by a marital property law change, but whether such a change reasonably could be believed to be sufficiently necessary to the public welfare as to justify the impairment."

*Addison,* 399 P.2d at 902 (quoting Armstrong, *supra,* at 495–96).[19] *Addison* has

---

**19.** Armstrong developed her thesis in part in reliance on two, at this point relatively old, United States Supreme Court cases, *Warburton*

*v. White,* 176 U.S. 484, 20 S.Ct. 404, 44 L.Ed. 555 (1900), and *Arnett v. Reade,* 220 U.S. 311, 31 S.Ct. 425, 55 L.Ed. 477 (1911), *rev'g Reade v. De*

since been followed in California to uphold retroactive changes in marital property laws. *See In re Marriage of Powers*, 218 Cal.App.3d 626, 267 Cal.Rptr. 350 (statute abrogating "terminable interest rule" in connection with spousal retirement benefits could be applied retroactively), *review denied* (1990); *Taylor v. Taylor*, 189 Cal. App.3d 435, 234 Cal.Rptr. 486 (same), *review denied* (1987); *Howard v. Howard*, 184 Cal.App.3d 1, 228 Cal.Rptr. 813 (1986) (statute allowing modification of family home award could be applied retroactively).

We need not adopt the *Addison*–Armstrong theory in its entirety in order to say, as we do, that many of the principles espoused in the theory find strong support in New Mexico law and that the theory therefore provides still another basis for our holding that the 1984 Act applies retroactively to property acquired before its passage. In *Wiggins v. Rush*, for example, we said:

> The State of New Mexico has a vital interest in the marital status. This interest is clearly expressed in our statutory framework concerning the marital status, including its creation, dissolution, and the methods by which the parties to the marriage can hold property. It is this vital state interest in the marital status that distinguishes the marriage relationship from other contractual relationships. . . .
>
> . . . New Mexico's interest in the protection of the family relationship, as expressed in our statutes, indicates that the state deems itself an interested party when the community estate and the marriage itself are affected.

83 N.M. at 138, 489 P.2d at 646.

It is, after all, in large part a *presumption* we are dealing with in this case—the presumption added by the 1984 amendment as the second sentence in Subsection 40–3–8(B);[20] and presumptions and other remedial measures are the stuff of which retroactivity is made. *See, e.g., Minero v. Dominguez*, 103 N.M. 551, 552–53, 710 P.2d 745, 746–47 (Ct.App.1985) (general rule against retroactivity does not apply to statutes that are procedural); *Mota v. State (In re Mota)*, 114 Wash.2d 465, 788 P.2d 538, 541 (1990) (en banc) (statutory amendment "deemed remedial and applied retroactively when it relates to practice, procedure or remedies, and does not affect substantive or vested right"). The presumption is consistent with and reinforces the longstanding, basic presumption of New Mexico community property law, now contained in Subsection 40–3–12(A), that property acquired during marriage is community property. The presumption established by the 1984 amendment is rebuttable by showing that property is separate property under Subsection 40–3–8(A)—*e.g.*, that it was acquired by either spouse before marriage or by gift, bequest, devise, or descent.

■ It is well settled that when a spouse merely places his or her separate property into joint tenancy with the other spouse, without an intention to make a gift or otherwise transmute the separate property into a true joint tenancy in which each spouse has an undivided one-half interest, the property retains its character as separate property. *LeClert v. LeClert*, 80 N.M. 235, 237, 453 P.2d 755, 757 (1969); *Burlingham v. Burlingham*, 72 N.M. 433, 441–45, 384 P.2d 699, 705–08 (1963). By the same token, property which *is* community property—because it has been acquired during marriage and is attributable, for example, to the earnings of one or both spouses, *see Douglas v. Douglas*, 101 N.M. 570, 571, 686 P.2d 260, 261 (Ct.App.1984)—retains its character as such and is not

---

*Lea*, 14 N.M. 442, 95 P. 131 (1908). Both cases held that a community property state's modification of its community property law could apply, constitutionally, to property acquired before enactment of the modification. *Arnett* arose in New Mexico, and the Supreme Court's decision reversed a holding of this Court that such an application of a statute to previously

acquired community property would impair vested rights and thus be unconstitutional.

20. "Property acquired by a husband and wife by an instrument in writing whether as tenants in common or as joint tenants or otherwise will be presumed to be held as community property unless such property is separate property within the meaning of Subsection A of this section."

"converted" from the community property of both spouses into the separate property of either or both,[21] absent persuasive evidence that the parties intended to transmute their community property into separate property. *See In re Trimble's Estate*, 57 N.M. at 56–64, 253 P.2d at 808–13; *Wiggins v. Rush*, 83 N.M. at 135–36, 489 P.2d at 643–44. The presumption in the second sentence of Subsection 40–3–8(B) reaffirms this basic tenet of community property law, while recognizing that such community property can be held in joint tenancy to achieve the survivorship feature of that form of ownership.

### IV.

We do not perceive our holding as working any injustice upon Mrs. Fingado. Under Subsection 40–3–11(A), her interests in the Vermont Street and Rio Grande Boulevard properties were subject to payment of the Fingados' community debts (subject to applicable exemptions), whether those properties were deemed community property or property in which each spouse owned an undivided equal interest as a joint tenant. Our holding is that under the 1984 amendments to this state's community property statutes, the properties were properly characterized as community property and were therefore included in the bankruptcy estate under Subsection 541(a)(2) of the Bankruptcy Code.

IT IS SO ORDERED.

BACA and FROST, JJ., concur.

---

**21.** It is in this sense that we qualify our affirmative answer to the Tenth Circuit's question. The 1984 amendments to § 40–3–8 did not necessarily "convert" property originally held as separate property into community property; in a very real sense, the property may be regarded as having been community property all along. No evidence was adduced in the bankruptcy court or the district court as to the source of the funds used to acquire the properties or that the properties may have been classifiable as separate property under § 40–3–8(A), so the presumption in § 40–3–8(B) was applicable and the properties were properly regarded as the Fingados' community property.